CLARKE CONTRACTING COMPANY, Appellant, Respondent, *v.* THE CITY OF NEW YORK, Respondent, Appellant.

First Department, April 19, 1918.

Municipal corporations — contract for removal of ashes, etc.— city must use reasonable diligence to have dumps in condition for use — contractor had knowledge that dumps not in repair — use of deck scows rather than deep sea dumpers — evidence as to weather conditions — action for breach of contract — counterclaim — when cause of action is prematurely asserted.

The proposals for bids on a contract to be made with a city for loading and trimming deck scows, deep sea dumpers and other vessels used to receive and transport ashes, street sweepings, etc., stated that bidders must satisfy themselves by personal examination as to the quality, quantity and nature of the work to be done and of the value of the privilege, and should not after the submission of a bid dispute or complain as to the statements of the amount or kinds of materials to be handled, etc., and that the commissioner might cause any water front to be temporarily closed for the purpose of dredging and repair and might cause the diversion of material to another dump. When the contract was let on August 12, 1913, three of fourteen water front dumps which bidders were informed belonged to the city could not be used. *Held*, that the city was not required to have the dumps in condition upon July 2, 1914, when the contract was to go into effect, provided it used reasonable diligence to put them in condition for use.

The contractor having been told that the repairs to the dumps would be completed before January 2, 1914, the city was bound after that date

to furnish him with such water front dumps as could reasonably be substituted for those out of repair.

Where the contractor had knowledge of the existing conditions, the city, having stipulated that refuse and ashes should be ridden to other dumps with a right in the contractor to pick therefrom, was not chargeable with default in furnishing cellar dumps or other dumps, provided it furnished the best dumps available for the purposes of the contract.

Where the contract contained no provision that deck scows should be furnished either exclusively or mainly, and all parties necessarily contemplated and relied upon the assumption that the contractor who transported rubbish, as a matter of policy and economy, would use the deck scows rather than the deep sea dumpers, there was no violation of the contract by the city to whatever extent the transporting company used deep sea dumps.

In an action against the city for breach of contract because the use of deep sea dumps impaired plaintiff's opportunity to pick over the refuse, evidence tending to show that there were no weather conditions which created an emergency calling for their use is immaterial and properly excluded.

The contract was to run for three years from January 2, 1914. This action was commenced June 11, 1915, and the answer setting up a counterclaim for the recovery of damages sustained by plaintiff's refusal to fulfill the contract was verified August 28, 1915, prior to the time when the contract would have expired and when the deficiency could have been ascertained. *Held,* that the cause of action alleged in said counterclaim being for the difference in the amount the city would have received from the contractor and the amount which it would receive under another contract made with it for dumping was prematurely asserted.

CROSS-APPEALS by the plaintiff, Clarke Contracting Company, and by the defendant, The City of New York, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 27th day of April, 1917, upon the verdict of a jury for defendant without damages, and also from an order entered in said clerk's office on the 24th day of April, 1917, denying plaintiff's motion for a new trial made upon the minutes.

*L. Laflin Kellogg* of counsel [*Alfred C. Petté* with him on the brief; *Kellogg & Rose,* attorneys], for the appellant, respondent.

*John F. O'Brien* of counsed [*Terence Farley, R. Percy Chittenden* and *Benjamin Shapiro* with him on the brief; *William P. Burr, Corporation Counsel*], for the respondent, appellant.

SMITH, J.:

This action is brought for damages against the defendant for a breach of contract. The counterclaim is for damages claimed to have been suffered by the defendant for a breach of the same contract claimed to have been committed by the plaintiff. The contract undertaken by the plaintiff's assignor was in loading and trimming deck scows, deep sea dumpers and other vessels used for the receipt and transportation of ashes, street sweepings and rubbish in the borough of Manhattan at fourteen water front dumps of the department of street cleaning. The contract called for the payment by the plaintiff of the weekly sum of $1,401.21 after January 2, 1914, when the contract was to go into effect. It was recited that a consideration for this should be the privilege granted to the contractor to pick over, sort, reclaim and appropriate from the materials handled whatever it might deem of value for a period of three years from January 2, 1914, with a right to the city to renew the contract for another period of two years. The plaintiff was required to make a deposit of $15,000, and the recovery of that deposit is a part of the relief asked for. The contract was made on August 12, 1913, although it was not to go into effect until January 2, 1914. This contract was assigned by the contractor to the plaintiff, which entered upon the performance thereof on January 2, 1914, and continued therein until April eleventh of that year, at which time the plaintiff gave to the defendant a notice of its rescission of the contract.

*First.* The first ground upon which plaintiff bases its right of rescission is for the failure of the city to furnish the plaintiff fourteen water front dumps at the date that the plaintiff was to enter upon the performance of the contract. In the information to bidders, there were fourteen dumps stated to be the water front dumps of the city. The contract was made on August twelfth. At that time there were three of those water front dumps that could not be used, but were in the process of repair. These were out of repair by reason of fires, which had occurred prior thereto. In the proposals for bids or estimates it was stated: " Bidders must satisfy themselves by personal examination and by such other means as they may select as to the quality, quantity and nature of the work to be

First Department, April, 1918.                    [Vol. 182.

done under this contract and as to the value of the privilege involved and shall not at any time after the submission of a bid or estimate dispute or complain of the foregoing statements as to the amounts or kinds of materials to be handled or assert that there was any misunderstanding in regard to the nature and kind of the work to be done or in regard to the value of the said privilege."

The plaintiff made personal examination and discovered that these three dumps were not in condition for use but were in process of repair. The plaintiff claims that it was told that the repairs would be completed before January second, when work was to be commenced under the contract. The trial judge submitted to the jury whether those repairs were made with reasonable diligence by the city, and the jury has found that they were. It is further provided in the specifications: "The Commissioner may cause any water-front dump to be temporarily closed for the purpose of necessary dredging, or for the purpose of needed repair to the dumping structure, and he may cause the diversion of the material ridden to such closed dump to be diverted to another dump, and the said temporary closing of the dump and diversion of material shall not be taken as a basis for a claim by the Contractor for damages or for prospective profits or for any other reason."

The contention of the plaintiff is that this provision in the contract refers only to dumps that shall be found in need of repairs after January 2, 1914. The trial court has held, however, that the city was not required to have these dumps in condition upon January 2, 1914, provided the city had used reasonable diligence to put them in condition for use. With this construction of the contract we are fully in accord. Whether or not this special provision in the contract refers to dumps that became out of repair prior to January second, with full knowledge of the plaintiff of the conditions existing upon August twelfth, we are of opinion that the city has in this respect violated none of its obligations assumed in the contract to such an extent as to authorize plaintiff to rescind the contract.

The city was undoubtedly bound after January 2, 1914, to furnish to the plaintiff such dumps as reasonably could

be substituted for the dumps that were out of repair. One of the plaintiff's complaints is that the city was to furnish dumps which would give to the plaintiff equal facilities for obtaining the pickings from the ashes and rubbish that were dumped, and that in place of the dumps which were thus withheld for necessary repairs, the city furnished only cellar dumps and inferior dumps, by reason of which the plaintiff was deprived of a large part of the value of its contract because of the impossibility of reclaiming and appropriating the pickings and the material from said dumps. But the city had no other water front dumps which could be furnished, except those which were withheld for necessary repairs. This was known to the plaintiff, as the manager of the plaintiff, Dewilde, had formerly been in the employ of the city and had full knowledge of existing conditions. When, therefore, it was stipulated that the refuse and ashes should be ridden to other dumps, the city might use such other dumps as it could find, giving to the plaintiff the right to the pickings from those dumps wherever they might be found. It is not shown that the city had other or better dumps which it could have furnished to the plaintiff as substitute dumps. There was nothing in the contract compelling them to furnish water front dumps in substitution, and in view of all these conditions known to the plaintiff, the city could not be charged with default in furnishing cellar dumps or other dumps, provided it furnished the best dumps available for the purposes of the contract.

*Second.* Another complaint, upon which the plaintiff strongly relies, is that there were furnished for the carrying off of these ashes what were called " sea dumpers," instead of " deck scows," and that the plaintiff was deprived, therefore, of from twenty-five to thirty per cent of the value of its right of picking because of the construction of these sea dumpers as not furnishing the opportunity for picking that could be had upon the deck scows. The contract stated that it was the purpose of the contract to provide for the loading and trimming of the deck scows, dumpers and other vessels at the water front dumps of the department of street cleaning in the borough of Manhattan. There is no provision in the contract that deck scows should be furnished either exclusively or mainly.

First Department, April, 1918. [Vol. 182.

It may be that standing alone this privilege of picking would imply an obligation upon the part of the city to furnish within reasonable limits the best scows upon which the picking could be had. It had been the custom to furnish deck scows instead of the deep sea dumpers, except in case of emergency. Ashes and rubbish put upon these deck scows were taken to Riker's island and there placed for the purpose of " filling in," while these deep sea dumpers were used for the purpose of taking the refuse far out into the ocean, which they were required to do before the rubbish could be dumped. It was in the interest of the contractors who transported this rubbish to use the deck scows wherever possible, as the transportation would be for a shorter distance and some compensation could be received for the dumping of this rubbish for the purpose of filling in. The evidence is that there were places around New York where these " fill ins " were sought, which would take the rubbish of the city for many years. All parties necessarily contemplated that the contractor who transported this rubbish would, as a matter of policy and economy, use the deck scows and use the rubbish for filling in, rather than use the deep sea dumpers, which were required to go far into the ocean before the rubbish could be dumped. At the same time and upon the same date when this contract was made with the plaintiff's assignor, another contract was made with Dailey and Ivins or the transportation of this rubbish. In the earlier contracts for transportation, it had been provided that the deck scows should be used unless in case of emergency, where it was impossible to use them, as where there was ice in the river, or heavy storms, or other weather conditions. In this contract with Dailey and Ivins, however, this limitation was not included. The witness Dewilde, who was the manager of the plaintiff, had knowledge of the fact that that limitation had been theretofore placed in the contract for transportation of this refuse and it was also called to his attention that in this contract which was executed the same day, this limitation of the use of deep sea dumpers was omitted. That was discussed between Dewilde and the officers of the city, and the reason of it was stated to be that there were times when the refuse had to be transported and sufficient deck scows could not be obtained, while in order to

get rid of this refuse, deep sea dumpers were required to be used, even where the emergency of river ice or bad weather did not arise. It was stated that it was not the intention to change the policy in the use of deep sea scows rather than these deck scows, and that they should be used only in case of emergency, but both parties relied upon the assumption that the transporting contractor would use the deck scows wherever possible on the ground of economy and business policy. In view of these facts, it is impossible to read into the contract any stipulation in reference to their use, and the trial court properly held that there was no violation of the contract to whatever extent the transporting company used these deep sea dumps. The plaintiff offered to prove that there were no weather conditions which created an emergency from that standpoint, calling for the use of the deep sea dumps. This was properly held to be immaterial by the trial court because of the lack of contract obligation to limit their use.

The trial court charged the jury in part as follows: " The failure by the City to perform this contract in every respect would not justify a rescission by the plaintiff. *It must have been so substantial as to leave the subject of the contract substantially different from what was contracted for.* In determining this you are to find the relative importance of the privilege at the docks which were not in commission. If you find the fact to be that the City withheld the use of these dumps without sufficient excuse, *that this was a substantial impairment of the contract in its whole scope,* then the plaintiff is entitled to recover its deposit of $15,000 and such damages in addition as it has proved it has suffered by the loss of the use of the dumps up to the time that it rescinded the contract and abandoned further performance, namely April 11th."

Under this charge we think the jury was justified in finding that the defendant had not so far breached its contract " as to leave the subject of the contract substantially different from what was contracted for." The judgment so far as appealed from by plaintiff must, therefore, be sustained.

*Third.* But the city also appeals from the judgment upon the ground that if the facts do not justify the plaintiff's rescission of the contract, then the plaintiff is in fault in

not performing the contract, and the city is entitled to recover any damages sustained by the failure of the plaintiff to fulfill the contract.   The trial judge at first so charged the jury, but thereafter he allowed the jury to find a verdict for the defendant without damages, and thus the jury found.   After the plaintiff had abandoned the contract, the city advertised again for bids for the same work and the highest bidder offered only $725.21 per week for performing the obligations of the contract and receiving the benefits therefrom.   The difference between the amount which the city would thus receive under this second contract and the amount that it would have received under the plaintiff's contract, if performed, amounts in three years to over $100,000, which the city counterclaims and here claims the right to recover.   In answer to the defendant's appeal, the plaintiff contends that the city's cause of action as asserted in its counterclaim is premature, as the contract with the subsequent contractor might at any time be forfeited and still another contract made for a price in excess of the stipulated price that the plaintiff was required to pay to the city under its contract, so that at the end of the three years the city would have suffered no damage by reason of the plaintiff's rescission of its contract. This cause of action asserted by the city seems to me to be analogous to an action upon a lease by the landlord which contains a covenant by the lessee that in case of an abandonment by the lessee, or the termination of its tenancy by summary proceedings, the tenant will nevertheless be liable for the difference between the rent the tenant covenants to pay and the rent that the landlord is able to obtain from a subsequent tenant during the time specified in the lease.   This contract was to run for three years from January 2, 1914. This action was commenced the 11th day of June, 1915, and the answer asserting this counterclaim was verified August 28, 1915, prior to the time when the contract would have expired and when the deficiency could have been ascertained.   Under the authorities, the cause of action thus alleged in the defendant's counterclaim was prematurely asserted.   (*Harding* v. *Austin*, 93 App. Div. 564; *Gulick* v. *Thompson*, 165 N. Y. Supp. 788.)

There are other questions presented in the appellant's

brief which have been considered, and which are not deemed of sufficient importance for discussion.

The judgment must, therefore, be affirmed, without costs to either party.

CLARKE, P. J., PAGE, DAVIS and SHEARN, JJ., concurred.

Judgment affirmed, without costs. Order to be settled on notice.